Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SEDNA HERRMAN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SEDNA HERRMAN, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>EVERYDAY HEALTH MEDIA, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff SEDNA HERRMAN ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant EVERYDAY HEALTH MEDIA, LLC, a Delaware limited liability company ("Defendant" or "Everyday Health"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.everydayhealth.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on August 4, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received.

3. Plaintiff's HAR file accordingly records the requests her browser transmitted to the third parties identified below during that session, including the named parameters carrying the contents of her communications and the persistent identifiers transmitted with them. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in the HAR file, and are included as corroboration.

4. During her use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications and reveal her personal searches and content interests.

5. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what she was

browsing, the page titles identifying the subject matter of the articles she was reading, and the terms she entered in the Website's search function, by causing each such communication to be duplicated and routed to the Third Parties over a separate channel while the same content was still being transmitted between her browser and servers operating under Defendant's control.

6. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

7. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Plaintiff directly observed the Website configured in this manner during her August 4, 2026 session, and it remains so configured. On information and belief, the Website was configured in this manner throughout the class period. The dates and duration of Defendant's deployment of the Trackers are reflected in tag-management records and agreements within Defendant's possession and control.

## II. GENERAL ALLEGATIONS

8. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

9. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior

navigation, session-level identifiers, and browser and device characteristics.

10. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Google Tracker
- The LiveIntent Tracker
- The DeepIntent Tracker

11. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

12. The Trackers are operated by distinct third parties, including Google LLC (as to the Google advertising and analytics tags), LiveIntent, Inc. (as to the LiveIntent tag), and DeepIntent, Inc. (as to the DeepIntent bidding integration). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load. Defendant's own account identifiers are carried on the Trackers' transmissions. The Trackers are not resources users request and are not necessary to render the Website's content or functionality.

13. Defendant configured the Website so that the contents of each user's communication with the Website were duplicated into separate third-party transmissions. When a user's browser requested a page, code that Defendant embedded on the Website obtained the contents of that communication from the state of the browser for the page then being loaded, wrote those values into named parameters of separate requests, and directed the browser to send those requests to servers the Third Parties control. Those additional transmissions were not part of the content the user requested from the Website and served no part of the user's request for that page.

14. Plaintiff and the Class Members did not consent to the installation,

execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

16. Plaintiff SEDNA HERRMAN is a California citizen residing in Los Angeles County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on August 4, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17. Defendant EVERYDAY HEALTH MEDIA, LLC is a Delaware limited liability company with its principal place of business in New York, New York. Defendant owns, operates, and controls the Website, an online consumer-health and medical-information website. Through the Website, Defendant publishes articles, news reporting, and educational content concerning health conditions, medical research, treatments, nutrition, mental health, fitness, and related health-and-wellness topics.

18. Defendant owned, operated and controlled the Website at all times during the class period, and publicly identifies EverydayHealth.com among the properties it operates.

19. Through the Website and related digital platforms, Defendant conducts media and publishing business nationwide and serves readers in California and throughout the United States.

/ / /

## IV. JURISDICTION AND VENUE

20. Defendant is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

21. Defendant has cultivated California as a significant market for its content and its digital audience. The Website serves as a primary digital channel through which Defendant distributes articles, news reporting, and educational content concerning health conditions, medical research, treatments, nutrition, mental health, fitness, and related health-and-wellness topics to California readers.

22. In furtherance of those operations, Defendant entered into and maintained commercial partnerships with data and advertising companies, including Google LLC, which is headquartered in Mountain View, California, and whose advertising and analytics infrastructure Defendant embedded on the Website.

23. Through those partnerships, Defendant embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by those companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of her communications occurred on her device in California; and the intercepted data flowed to servers operated by companies that conduct operations from California. Plaintiff's claims arise directly from Defendant's purposeful direction of its Website and embedded data-collection systems at California residents.

24. Defendant deliberately reached out beyond its state of organization by knowingly installing the Trackers onto unsuspecting California users' devices so that it could later use and monetize the data it obtained from those Trackers, in a manner that was neither random, isolated, nor fortuitous.

25. The Website's own Privacy Policy, as published to visitors when Plaintiff used the Website, is directed in part specifically at California residents. It sets out a

section of rights applicable to California consumers, including a right to opt out of the sale or sharing of personal data for targeted advertising, and it directs California residents to Defendant's privacy portal to exercise that right. Defendant therefore knew that it served California residents, knew that its data practices were governed by California law, and structured its disclosures accordingly.

26. Defendant's purposeful direction of its tracking infrastructure at California, its commercial partnership with a California-headquartered advertising company, and the California-specific provisions in the Website's own Privacy Policy collectively establish that Defendant has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

27. Plaintiff's claims arise out of and relate to Defendant's forum-related conduct. Plaintiff's communications were intercepted on her device in California, while Plaintiff was located in California, by Trackers Defendant deliberately embedded on its Website.

28. Exercising specific personal jurisdiction over Defendant in this District comports with constitutional notions of fair play and substantial justice. Defendant is an established digital media company with substantial commercial operations directed at California residents, and Defendant cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers Defendant itself embedded on its Website.

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States

Constitution.

31. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

32. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from her Los Angeles County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

33. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

34. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

35. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing.

36. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2. The Federal Wiretap Act**

37. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

38. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

39. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in

appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

40. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications:

- https://www.everydayhealth.com/menopause/guide/;
- https://www.everydayhealth.com/womens-health/hormone-therapy-for-menopause/;
- https://www.everydayhealth.com/high-blood-pressure/guide/;
- https://www.everydayhealth.com/hypertension/why-should-people-with-high-blood-pressure-not-take-antihistamines/;
- https://www.everydayhealth.com/womens-health/things-to-know-about-early-menopause/; and
- https://www.everydayhealth.com/womens-health/abortion-restrictions-limiting-access-to-obgyns-for-other-healthcare/.

41. During the same session Plaintiff also used the Website's search function, entering the terms abortion, breast augmentation removal, menopause, and high blood pressure. Each search produced a results page whose own address carried the terms Plaintiff had entered, in the form https://www.everydayhealth.com/search/?q= followed by those terms.

42. During each of the visits identified above, the Trackers described below operated on the Website. Each Tracker received the contents of Plaintiff's communications with the Website in named parameters of its own outbound requests. The captures reproduced below illustrate what occurs during live browser access to those pages.

/ / /

**1. The Google Tracker**

43. Defendant embedded and configured on the Website two distinct Google integrations, together with Google's analytics tag. The first is Google's publisher advertising integration: Defendant loads Google's publisher tag library from securepubads.g.doubleclick.net and causes Plaintiff's browser to send publisher ad requests to securepubads.g.doubleclick.net and pubads.g.doubleclick.net, each carrying Defendant's own Google Ad Manager network and ad unit identifiers. The second is Google's advertiser tag: Defendant causes Plaintiff's browser to send requests to googleads.g.doubleclick.net and to www.google.com carrying Defendant's own Google Ads account identifiers, being 17782796745, 11474991986 and 1070833030. Defendant separately deploys Google's analytics tag, which transmits to www.google-analytics.com. None of these is a resource Plaintiff requested and none is necessary to render the Website's content.

44. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed Google's code. That code obtained the address of the page then being loaded and the title of that page, wrote those values into named parameters of new requests, and directed Plaintiff's browser to send those requests to the Google endpoints identified above. On the publisher advertising path the address was carried in the named url parameter of the ad request. On the advertiser tag path it was carried in the named url and dl parameters. A persistent Google advertising identifier was transmitted in the same requests, and the same identifier accompanied Google transmissions throughout Plaintiff's session.

45. The values Google received in those named parameters, from Plaintiff's own session, included the full address of each of the pages identified above, the address of each of the Website's search results pages carrying the terms Plaintiff had entered, and the full titles of the articles Plaintiff was reading, including: "What Is Menopause and the Menopausal Transition? Symptoms, Causes, Diagnosis, and Treatment";

"Hormone Therapy for Menopause: Benefits, Risks, and Types"; "What Is High Blood Pressure? Symptoms, Causes, Diagnosis, Treatment, and Prevention"; "Are Antihistamines OK if I Have High Blood Pressure?"; "Early Menopause: Symptoms, Risks, and Treatments"; and "Fewer Ob-Gyns Practice in States With Abortion Restrictions, Reducing Women's Overall Healthcare Access". Plaintiff's session contained four hundred ninety-three transmissions to Google endpoints.

46. Google publishes documentation addressed to publishers using the publisher advertising integration described above. Google states that ad requests made through its publisher ad tags serve personalized ads by default, and that the selection of the advertisement is based on both the content of the web page and the history of the individual user visiting that page. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538. Selecting an advertisement on the basis of the content of the page cannot be done without ascertaining what the transmitted address and title say, and Google performs that selection in response to the request that carries them.

47. Google publishes separate documentation addressed to advertisers using the advertiser tag described above. Google states that visitors are added to an advertiser's data segments within seconds after visiting a page carrying that tag. About your data segments, Google Ads Help, https://support.google.com/google-ads/answer/2472738. Plaintiff's session establishes that path independently: her browser transmitted the address of each page she viewed to Google endpoints whose own paths are named for user-list and remarketing collection, each under one of Defendant's Google Ads account identifiers. Placing a visitor into a segment because of the page she visited is an operation performed on the identity of that page, and it is performed at the moment the page is loaded.

48. Google gives publishers a parameter that suppresses personalized advertising, and documents that omission of the parameter defaults to personalized ads

and that the parameter is stateless, so that where it is not set on a later request the behavior reverts to personalized ads. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538. No publisher ad request in Plaintiff's session carried that parameter. On the advertiser tag path, four hundred eighty-four transmissions affirmatively requested personalized advertising, and across the session seven hundred ninety-one transmissions carried a United States Privacy string signaling that no opt-out had been exercised.

49. Google instructs publishers to confirm the setting by locating the ad request in the browser's developer tools and examining that parameter. Defendant, which placed and configured the tags, therefore knew what the tags transmit, knew that personalization was the default, and knew how to see and change it. Ads personalization settings in Google's publisher ad tags, Google Ad Manager Help, https://support.google.com/admanager/answer/7678538.

50. Figure 1 is a network capture of an outbound request transmitted to Google during the load of the Website's menopause guide identified above. The full page address and the full page title are carried in named parameters of the same request, together with a persistent Google identifier.

/ / /

/ / /

/ / /

**Figure 1**




51. Figure 2 is a network capture of an outbound request transmitted to Google during the load of the Website's high blood pressure guide identified above, carrying the same categories of values.

**Figure 2**




52. Google LLC is not a party to the communications between Plaintiff and the

Website. It operates an advertising and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tags on the Website.

**2. The LiveIntent Tracker**

53. Defendant embedded and configured on the Website an identity and audience tag operated by LiveIntent, Inc., which transmits to servers at rp.liadm.com and rp4.liadm.com. The tag carries Defendant's own LiveIntent application identifier on every transmission. It is not a resource Plaintiff requested and is not necessary to render the Website's content.

54. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed LiveIntent's code. That code obtained the address of the page then being loaded, wrote that value into the named parameter pu of a new request, and directed Plaintiff's browser to send that request to the LiveIntent endpoints identified above.

55. LiveIntent publishes documentation identifying that parameter. LiveIntent defines pu as the address of the page on which the event occurred and refr as the address of the referring page, each populated by what LiveIntent calls its page enricher. COLLECTOR_PARAMS, LiveIntent live-connect, https://github.com/LiveIntent/live-connect/blob/master/COLLECTOR_PARAMS.md.

56. LiveIntent separately publishes documentation for publishers stating that its tag registers page views from visitors and collects data including the address of the page visited and the referring address, and that a domain cookie and a network identifier are set. LiveConnect for Publishers: Frequently Asked Questions, LiveIntent Knowledge Base, https://support.liveintent.com/hc/en-us/articles/212163983-LiveConnect-for-Publishers-Frequently-Asked-Questions-FAQ-.

57. The values LiveIntent received in the pu parameter, from Plaintiff's own session, included the full address of each of the pages identified above and the address

of each of the Website's search results pages carrying the terms Plaintiff had entered. A persistent LiveIntent device identifier was transmitted in the same requests and remained constant throughout the session. Plaintiff's session contained twenty-eight such transmissions.

58. LiveIntent publishes documentation describing what it does with those addresses. It instructs its customers that audiences may be built from page views, and that a rule may be configured to select the people who have visited a specified address, expressed as a condition that the address contains a specified page. Creating a Dynamic Audience in Audience Manager, Zeta Global Knowledge Base, https://knowledgebase.zetaglobal.com/liveintent/creating-a-dynamic-audience-in-audience-manager. Testing a transmitted address against such a condition, in order to decide who belongs in an audience that is then sold for targeting, is an operation performed on what that address says. It cannot be performed without ascertaining its content.

59. Figure 3 is a network capture of an outbound request transmitted to LiveIntent at rp.liadm.com during the load of the Website's menopause guide identified above. The full page address is carried in the named pu parameter and the persistent device identifier in the same request.

/ / /

/ / /

/ / /

**Figure 3**




60. LiveIntent, Inc. is not a party to the communications between Plaintiff and the Website. It operates an identity resolution and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the tag on the Website.

**3. The DeepIntent Tracker**

61. Defendant embedded and configured on the Website a bidding integration operated by DeepIntent, Inc., which transmits to prebid.deepintent.com. The integration carries Defendant's own DeepIntent publisher and tag identifiers on every transmission. It is not a resource Plaintiff requested and is not necessary to render the Website's content.

62. Plaintiff's browser began loading the page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed DeepIntent's code. That code obtained the address of the page then being loaded, wrote that value into a named field of a new request body together with the Website's domain, and directed Plaintiff's browser to post that request to DeepIntent's server. A persistent DeepIntent cookie was transmitted with the same

request.

63. The request DeepIntent received is a bid request in the form specified by the Interactive Advertising Bureau's OpenRTB standard, and the named field carrying the address is the field that standard calls site.page. The standard defines that field as the address of the page where the advertisement will be shown, and states that the information accompanying a bid request is provided to assist bidders in making targeting and pricing decisions. OpenRTB Specification version 2.6, Interactive Advertising Bureau Technology Laboratory, https://github.com/InteractiveAdvertisingBureau/openrtb2.x/blob/main/2.6.md. The address of the page Plaintiff was reading was therefore not incidental routing information. Under the standard governing the transaction, it was supplied to DeepIntent so that DeepIntent could decide whether and how much to bid for the opportunity to advertise to her on that page.

64. The values DeepIntent received in that field, from Plaintiff's own session, included the full address of each of the pages identified above and the address of each of the Website's search results pages carrying the terms Plaintiff had entered. Plaintiff's session contained thirty-six such transmissions.

65. DeepIntent publishes a privacy policy describing what it does with information of that kind. DeepIntent states that it collects content view data and information about where content was viewed, and that among the uses it makes of the information it collects is showing advertisements based on the content the person is viewing, which it identifies as contextual targeting. Platform Privacy Policy, DeepIntent, https://www.deepintent.com/platform-privacy-policy/. Selecting an advertisement on the basis of the content a person is viewing cannot be done without ascertaining what that content is.

66. DeepIntent states elsewhere in its published materials that it may serve contextual advertisements, which it describes as targeting based on page content rather than by user. The Evolving Privacy Law Landscape and What it Means for You,

DeepIntent, https://deepintent.com/deepdive/privacy-law-landscape. DeepIntent therefore describes its own conduct in the terms the statute uses: it determines what a page is about and acts on that determination.

67. DeepIntent describes itself as a demand-side platform purpose-built for healthcare and pharmaceutical advertising, built on a clinical data foundation of medical and pharmacy claims, prescribing behavior and diagnosis codes, and used to reach people associated with a given condition. What is a Healthcare DSP, DeepIntent, https://deepintent.com/deepdive/healthcare-dsp. It is not a passive recipient of a publisher's telemetry. It operates an audience business of its own into which the transmitted content is taken.

68. The same request body in which DeepIntent received the address of the page Plaintiff was reading also carried an array of identifiers resolving Plaintiff's browser across other companies, naming among others LiveRamp, LiveIntent, BidSwitch, TripleLift, Media.net, Rubicon Project, Index Exchange, OpenX, PubMatic, Sharethrough, Sovrn, Sonobi, Google and PubCID. The contents of Plaintiff's communication were therefore transmitted attached to a set of identifiers by which she is recognized across sites operated by parties other than Defendant.

69. Figure 4 is a capture of the outbound request transmitted to DeepIntent during the load of the Website's menopause guide identified above, shown alongside the page as it was displayed to Plaintiff. The full page address is carried in the named site.page field, the Website's domain in the adjacent field, and the array of cross-company identifiers in the same request body.

/ / /

/ / /

## Figure 4




70. Figure 5 is a network capture of the outbound request transmitted to DeepIntent during the load of the article on antihistamines and high blood pressure identified above, carrying the same categories of values.

## Figure 5




71. DeepIntent, Inc. is not a party to the communications between Plaintiff and

the Website. It operates an advertising and audience data business of its own and has the capability to use its record of these interactions for its own purposes. Defendant aided and abetted that interception by embedding and configuring the integration on the Website.

**4. Defendant's Own Description of the Practice**

72. The Website's Privacy Policy, effective November 1, 2024 and in force when Plaintiff used the Website, describes the practice alleged here. Defendant states that it and certain third parties collect information for online behavioral advertising, and defines the information so collected to include information about a visitor's visits to and engagement with the Website, together with log data, clickstream data and referring pages.

73. Defendant further states that this information is aggregated in order to create groups of users and general-interest categories or segments that Defendant has inferred based on, among other things, the pages the visitor views and the links the visitor clicks when using the Website, and the search terms the visitor enters when using certain search services. Defendant states that it stores page views, clicks and search terms used for ad personalization. Inferring a category from the pages a person views and the terms she searches is an operation performed on what those pages and terms say.

74. Defendant further states that it may sell or transfer that information to third parties such as advertisers, who will use it to serve advertisements they believe are relevant to the person's interests, and that some of those third parties may combine it with their own data about that person. Defendant also states that it engages third parties for the purpose of recognizing its users and delivering interest-based content and advertisements to them.

75. Defendant's own description of its practice therefore matches the conduct the capture records: the addresses and titles of the pages Plaintiff viewed, and the terms she entered in the Website's search function, were taken as she used the Website, attributed to identifiers by which she is recognized, and made available to third parties

who use them in their own advertising businesses.

**5. Interception While in Transit**

76. Two sets of code ran as part of Plaintiff's browser's single attempt to load each page identified above. The first was the Website's own code, which delivered the page Plaintiff had asked for. The second was the Trackers' code, which Plaintiff did not request and which served no part of her request for that page. Plaintiff communicated with Defendant's servers in order to obtain the content she was reading. She did not communicate with any Tracker for that purpose, or for any purpose of her own.

77. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate transaction in which Defendant later furnished them. There was no interval in which the values sat at rest in Defendant's possession before the Trackers acquired them. The values the Trackers transmitted were read from the state of the browser for the page then being loaded, and they identified that page and no other.

78. Each of those transmissions was therefore initiated by the Trackers' own code and was concurrent with Plaintiff's communications with the Website, and the contents of those communications were acquired while in transit, while passing over a wire, line or cable, and while being sent from and received at Plaintiff's device in California.

79. The duplication was not limited to the Trackers identified above. As each article page loaded, the address of that page was written into named fields of separate requests and transmitted, as part of that same page load and in the same instant as one another, to more than twenty additional recipients. On the article on hormone therapy for menopause alone, twenty-six distinct third-party recipients received the address of that page.

80. Those transmissions are the real-time bidding process by which advertising space on the page Plaintiff was reading was offered for sale to advertisers while the page was still loading. Their number and their simultaneity establish that the contents of

Plaintiff's communication with the Website were replicated and sent in parallel to many separate commercial recipients at once. Plaintiff did not request content from any of those recipients, none of them was a party to her communications with the Website, and none of them was made known to her.

81. No action by Plaintiff was required to trigger any of these transmissions and none of them was visible to her. Plaintiff had no opportunity to see, review, prevent or object to any of them before they occurred.

82. Defendant knew of this arrangement and constructed it. Defendant's own account identifiers are carried on the Tracker transmissions described above, and Defendant's own first-party code and tag-management configuration cause each of the Trackers to load.

83. No privacy control prevented any of the transmissions. Across Plaintiff's session, seven hundred ninety-one transmissions carried a United States Privacy string signaling that no opt-out had been exercised, and four hundred eighty-four affirmatively requested personalized advertising. Defendant did not obtain Plaintiff's express prior consent to the interception and transmission of the contents of her communications by any Tracker.

## VII. CLASS ALLEGATIONS

84. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website and the terms they entered in the Website's search function, were intercepted by one or more Trackers, or by any other third party to which Defendant caused those contents to be transmitted, between August 4, 2025 and the present.

85. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class

Members can be ascertained by the records maintained by Defendant.

86. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests, and the terms visitors entered in the Website's search function, to the Trackers;
- Whether the URL contents of those requests, and the terms visitors entered in the Website's search function, constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

87. TYPICALITY: As a person who visited the Website and whose URL contents and search terms were intercepted, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class

Members.

88. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

89. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against Defendant

90. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Plaintiff brings this cause of action on behalf of herself and the Class.

92. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained. The same subdivision separately reaches any person "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

93. The page addresses, the page titles identifying the subject matter of the articles Plaintiff and Class members were reading, and the terms they entered in the Website's search function, all transmitted to the Trackers in named payload parameters, constitute the "contents" of those communications within the meaning of § 631(a). As

described in the preceding tracker-specific allegations, Defendant caused each such communication to be duplicated and sent in parallel to the Trackers at securepubads.g.doubleclick.net, googleads.g.doubleclick.net, cm.g.doubleclick.net, pubads.g.doubleclick.net, www.google.com, www.google-analytics.com, rp.liadm.com, rp4.liadm.com and prebid.deepintent.com, and each Tracker acquired those contents while the same communication was in transit between Plaintiff's browser and Defendant's servers.

94. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses, page titles and search terms to the Trackers, itself received and used those contents, and permitted the Trackers to use that information for their own profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies. Defendant is independently liable under the aiding provision of § 631(a). Defendant selected each Tracker, obtained an account for it, embedded its code on the Website, configured that code to execute automatically on page load, and caused Plaintiff's own browser to carry out each transmission. In doing so Defendant aided, agreed with, employed and permitted each Tracker to do the acts prohibited by § 631(a), and permitted and caused those acts to be done.

95. Section 631(a) reaches not only reading the contents of a communication but learning its contents or meaning. Selecting an advertisement on the basis of the content of the page being viewed, testing a transmitted address against a rule in order to decide who belongs in an audience sold for targeting, and evaluating a page identified in a bid request in order to decide whether and how much to bid for the opportunity to advertise on it, are each operations performed on the transmitted values in response to the request that carries them, and none can be performed without ascertaining what those values say.

96. Each interception constitutes a separate violation of § 631(a). Plaintiff and

the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

97. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Plaintiff brings this cause of action on behalf of herself and the Class.

99. 18 U.S.C. § 2511(1)(a) reaches any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

100. The page addresses, the page titles and the search terms transmitted to the Trackers in named payload parameters are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8), because they communicate the substance, purport and meaning of what Plaintiff and Class members were reading and searching for. As described in the preceding tracker-specific allegations, Defendant caused those contents to be duplicated and sent in parallel to the Trackers at the endpoints identified above, and each Tracker acquired them while the same communication was in transit.

101. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' page addresses, page titles and search terms to each Tracker, itself received and used those contents, and permitted each Tracker to use that information for its own profiling and targeted advertising. Defendant thereby intercepted those communications and, independently, procured each Tracker to intercept them, by selecting each Tracker, obtaining an account for it, embedding and configuring its code on the Website, and causing Plaintiff's own browser to execute that code and transmit

the contents on each page load. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

102. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of the sum of actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of the violation, or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, together with punitive damages, reasonable attorney's fees, and other litigation costs reasonably incurred.

## X. <u>THIRD CAUSE OF ACTION</u>

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

103. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

104. Plaintiff brings this cause of action on behalf of herself and the Class.

105. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

106. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

107. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not

outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

108. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

109. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

110. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against Defendant

111. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Plaintiff brings this cause of action on behalf of herself and the Class.

113. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

114. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs and page titles reflecting their browsing activity and the terms they entered in the Website's search function. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

115. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting an online consumer-health and medical-information website publishing articles, news reporting, and educational content concerning health conditions, medical research, treatments, nutrition, mental health, fitness, and related health-and-wellness topics does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

116. Defendant's conduct constitutes a serious invasion of that privacy. By embedding and configuring the third-party tracking technologies described above on the Website, Defendant caused the covert transmission to those third parties, in real time and in named parameters of their own requests, of the addresses and titles identifying the specific subject matter Plaintiff and Class Members were reading and the terms they entered in the Website's search function, each attributed to a persistent identifier.

Measured against community norms rather than against any characteristic particular to Plaintiff, that conduct constitutes an egregious breach of social norms.

117. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. <u>FIFTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

118. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

119. Plaintiff brings this cause of action on behalf of herself and the Class.

120. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

121. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party tracking technologies that intercepted the URL contents, page titles and search terms of those communications in real time and transmitted them to third parties. Defendant did so without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

122. The intrusion is highly offensive to a reasonable person. The pages identified above are descriptive on their face, and the addresses and titles transmitted identify the specific subject matter each visitor was reading, together with the terms each visitor entered in the Website's search function. Defendant covertly caused that information to be transmitted to the Trackers identified above and, as each article loaded,

to more than twenty additional commercial recipients, each attributing it to a persistent identifier assigned to the visitor's browser, for use in advertising and audience data products. A reasonable person would find the covert transmission of the specific subject matter of her own reading to multiple commercial entities, without prior notice and without any opportunity to prevent the transmissions before they occurred, highly offensive. The offensiveness is measured objectively and does not depend on any characteristic particular to Plaintiff.

123. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

124. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Plaintiff brings this cause of action on behalf of herself and the Class.

126. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

127. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

128. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

129. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

130. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense. Plaintiff pleads this claim in the alternative. Plaintiff lacks an adequate remedy at law as to the relief sought here, because the statutory damages available under Cal. Penal Code § 637.2 and 18 U.S.C. § 2520 are fixed sums that do not reach and are not measured by the profits Defendant derived from the ongoing commercial exploitation of Class Members' intercepted browsing data, and because restitution and disgorgement of those profits are measured by Defendant's gain rather than by Plaintiff's loss.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law

prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of the sum of actual damages and any profits made by Defendant as a result of the violation, or whichever is the greater of $100 a day for each day of violation or $10,000;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 13, 2026

**LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*

Ross Cornell, Esq.
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*